

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| T. AND B. EQUIPMENT COMPANY, INC.     ) ) ) | |
|          Plaintiff/      )        Counter Defendant  ) ) | |
| v.               ) ) | Civil Action No. 3:15-CV-337-HEH |
| RI, INC. d/b/a SEATING SOLUTIONS  ) ) | |
|         Defendant/    )       Counter Claimant.   ) | |

## MEMORANDUM OPINION
### (Cross-Motions for Summary Judgment)

This matter arises from the alleged violation of a mutual Non-Disclosure

Agreement (the "NDA") between T. and B. Equipment Company, Inc. ("T&B" or

"Plaintiff") and RI, Inc. d/b/a Seating Solutions ("Seating Solutions" or "Defendant").

Plaintiff seeks a declaratory judgment from this Court, affirming that its purchase of a

seating system from the manufacturer ("The Product People") did not constitute a

violation of the NDA.  Conversely, Defendant's Counterclaim alleges that Plaintiff's

actions did constitute a violation of the NDA, as well as an illegal interference with a

business relationship between Seating Solutions and The Product People, governed by a

separate agreement (the "Distribution Agreement").  Defendant's counterclaim consists

of five Counts, including Breach of Contract, Misappropriation of Trade Secrets, Tortious

Interference with Contract, Civil Conspiracy, and Misrepresentation.

The case is presently before the Court on the parties' cross-motions for summary judgment. Both sides filed supporting memoranda with pertinent attached documents. Oral argument followed on June 29, 2016. While each party notes some factual disagreement, the Court finds no genuine issue of material fact precluding resolution of the competing motions for summary judgment.

## I.    BACKGROUND

In reviewing cross motions for summary judgment, a district court must examine each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law." *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (4th Cir. 1997) (internal citations omitted). Furthermore, when considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st. Cir. 1996); *see also Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "Summary judgment is appropriate only if the record shows 'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (citing Fed. R. Civ. P. 56(c)).

The Court has reviewed each party's statement of undisputed facts, including the extensive supporting documentation filed in support of the respective positions. The Court has concluded that the following narrative represents the dispositive facts for the purpose of resolving the motions at hand.

T&B is a Virginia corporation that specializes in indoor and outdoor event seating. (Compl. ¶¶ 2, 7.) Seating Solutions is a business that sells and rents spectator seating. (Def. Mem. Supp. Mot. Summ. J. at 2.) T&B desired to purchase an upgrade for a seating system, which it rents to clients for the purpose of temporary large-scale spectator seating. (Countercl. ¶ 13.) T&B engaged Seating Solutions in order to explore seating systems available for purchase. (Countercl. ¶ 13.)

Specifically, T&B became interested in one particular seating system sold by Seating Solutions, the 901 Box Seat. (Countercl. ¶ 15.) Seating Solutions provided T&B with two separate written quotes for the 901 Box Seat on March 14, 2012 and April 19, 2012, at least one of which included a sample model of the 901 Box Seat. (Compl. ¶ 9; Countercl. ¶ 16.)

During the course of early discussions regarding the 901 Box Seat, Seating Solutions also expressed interest in selling its own seating rental business. (Compl. ¶ 10; Countercl. ¶ 10.) T&B reciprocated by acknowledging possible interest in the business acquisition. (Compl. ¶ 10; Countercl. ¶ 10; Def. Mem. Supp. Mot. Summ. J. at 12–13.) Accordingly, the companies entered into a Non-Disclosure Agreement on April 24, 2012. (Compl. ¶ 11, Ex. C ("NDA"); Countercl. ¶ 11.) The NDA contained an express provision stating that the purpose of the agreement was to govern the exchange of information and materials related to the **"potential acquisition of all or a part of Company."** (NDA ¶ A (emphasis added).) Further, the NDA expressly covered confidential information provided before and after the initiation of the agreement. (NDA ¶ 10.)

Following the signing of the NDA, T&B sent a due diligence checklist to Seating

Solutions in order to obtain more detailed information pertaining to its seat rental

business. (Compl. ¶ 14.)  Seating Solutions provided no information in return. (Compl. ¶

14.)

Negotiations stalled.  After significant time passed, Seating Solutions learned that

T&B had purchased 901 Box Seats directly from the manufacturer of the system, The

Product People. (Compl. ¶ 16.)  Seating Solutions sent a letter to T&B in December

2012, stating that it had provided information related to the 901 Box Seats in reliance on

the NDA and maintained an interest in reaching a deal. (Compl. ¶ 17, Ex. D.)

Over two years later, in February 2015, Seating Solutions sent another letter to

T&B, but this time via legal counsel. (Compl. ¶ 19, Ex. E.)  This letter claimed that

T&B's purchase of 901 Box Seats from The Product People constituted a violation of the

NDA and demanded that T&B pay Seating Solutions $30.00 for every seat purchased.

(Compl. ¶ 19, Ex. E.)  The demand totaled $320,700. (Compl. ¶ 19, Ex. E.)  T&B

rejected the demand in a March 2015 letter, claiming that it did not disclose any

confidential information in the process of purchasing the box seats from The Product

People and that the NDA did not require T&B to purchase the seats exclusively from

Seating Solutions. (Compl. ¶ 20, Ex. F.)  Seating Solutions sent another letter in April

2015, in which it maintained its position that T&B violated the NDA. (Compl. ¶ 21, Ex.

G.)

T&B filed suit in June 2015, seeking a declaratory judgment that its actions did

not constitute a violation of the NDA. (Compl.)  Seating Solutions counterclaimed,

4

alleging Breach of Contract, Misappropriation of Trade Secrets, Tortious Interference

with Contract, Civil Conspiracy, and Misrepresentation. (Countercl.) These claims are

rooted in alleged violations of either the terms of the NDA between T&B and Seating

Solutions, or the separate Distribution Agreement between Seating Solutions and The

Product People. Both parties seek Summary Judgment in their favor. (Pl. Mem. Supp.

Mot. Summ. J.; Def. Mem. Supp. Mot. Summ. J.)

## II.    STANDARDS OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The

relevant inquiry in a summary judgment analysis is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251–52 (1986). In reviewing a motion for summary judgment, the Court must view

the facts in the light most favorable to the non-moving party. *Id.* at 255.

Once a motion for summary judgment is properly made and supported, the

opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). Indeed,

summary judgment must be granted if the nonmoving party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).   To defeat an otherwise properly supported motion for summary

judgment, the nonmoving party must rely on more than conclusory allegations, "mere

speculation," the "building of one inference upon another," the "mere existence of a

scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a

material fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D.

Va. 2006) (citations omitted).   Of course, the Court cannot weigh the evidence or make

credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.*,

372 F.3d 662, 667 (4th Cir. 2004).

Furthermore, a "material fact" is one that might affect the outcome of a party's

case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*,

264 F.3d 459, 465 (4th Cir. 2001).   Whether a fact is considered to be "material" is

determined by the substantive law, and "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson*, 477 U.S. at 248; *see also Hooven-Lewis v. Caldera*, 249 F.3d 259,

265 (4th Cir. 2001).   A "genuine" issue concerning a "material" fact only arises when the

evidence, viewed in the light most favorable to the non-moving party, is sufficient to

allow a reasonable jury to return a verdict in that party's favor. *Anderson*, 477 U.S. at

248.

## III.   DISCUSSION

The determinative issue governing summary judgment is whether the Non-Disclosure Agreement between T&B and Seating Solutions governed both the possible purchase of 901 Box Seats (the "Seat Sale") and the potential acquisition of Seating Solutions' seat rental business by T&B (the "Business Acquisition"), or alternatively, only the Business Acquisition.  If negotiations relating to the Seat Sale are found to have been envisioned by the NDA and related correspondence, it must then be determined whether T&B's actions constituted a violation of its terms.  The viability of Seating Solutions' counterclaims of Breach of Contract, Misappropriation of Trade Secrets, and Misrepresentation depend upon whether the NDA encompasses the Seat Sale negotiations.

Further, Seating Solutions alleges that it maintained a special business relationship with The Product People, which allows for exclusive rights to distribute the product in North America. (Def. Mem. Supp. Mot. Summ. J. at 21.)  This relationship is purportedly detailed in a Distribution Agreement between the two companies.  (*Id.* at 8, Ex. 19 ("Distribution Agreement").)  The claims of Tortious Interference with Contract and Civil Conspiracy depend upon the validity and terms of the Distribution Agreement.

### A. NDA Coverage & Application of its Terms

It must first be noted that neither party contests the validity of the NDA as a contract. (Pl. Mem. Supp. Mot. Summ. J. at 4; Countercl. ¶ 34.)  Additionally, both parties agree, as the contract states, that it is to be "governed by and construed in

accordance with the laws of the State of New York." (NDA ¶ 17; Pl. Mem. Supp. Mot. Summ. J. at 5; Countercl. ¶ 27.)

T&B asserts that the NDA was only intended to apply to the negotiation of the Business Acquisition, not to the Seat Sale. (Pl. Mem. Supp. Mot. Summ. J. at 6.) Conversely, Seating Solutions contends that there was one comprehensive negotiation contemplated by the NDA, including both the Business Acquisition and the Seat Sale. (Def. Mem. Supp. Mot. Summ. J. at 15.)

New York law states that "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (internal citations omitted). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992). The terms of the contract, therefore, must be interpreted according to their plain meaning. *See Ellington*, 21 N.E.3d at 1003; *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002).

Evidence beyond the written agreement may only be considered if the terms of the agreement are ambiguous, and whether or not an agreement is ambiguous is a question of law to be decided by the court. *Greenfield*, 780 N.E.2d at 170. "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 170–71 (quoting *Breed v.*

8

*Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978)).   Conversely, "[a]mbiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations." *Ellington*, 21 N.E.3d at 1003 (citation and internal quotation marks omitted).

The purpose of the NDA is stated clearly at the outset of the agreement:

A. The Parties desire to exchange certain information and materials necessary or **related to the potential acquisition of all or a part of the Company** [Seating Solutions] and all information contained therein (the "Purpose").

(NDA ¶ A (emphasis added).)   The provision expressly states that the agreement is to govern information shared between the parties as a part of the "potential acquisition" of Seating Solutions, thus referring to the Business Acquisition.   At no point does the NDA's purpose discuss the sale or rental of 901 Box Seats or any seating system generally.

Further, such language concerning seats specifically does not appear anywhere else in the NDA.   The only language which may remotely lend credence to the NDA's contemplation of the sale of 901 Box Seats is the inclusion of "products" in the broad definition of "Information" in Paragraph One.   (NDA ¶ 1.)   However, this language fails to provide any helpful context.   Simply noting that confidential information is protected by an agreement (which is explicitly designated as governing a possible acquisition of all or one portion of a business), does not convey that the contract's purpose is also to govern a transaction involving the sale or rental of a product.   Additionally, there was no

clear indication by Seating Solutions that the seats in question or any related information should be considered confidential.

A simple reading leads this Court to conclude, based on the unambiguous language of the contract, that the intent of the parties was for the NDA to govern the possible Business Acquisition of Seating Solutions' seat rental business. Therefore the NDA did not contemplate the Seat Sale or related information. The Court realizes that each party argues a different interpretation of the text and surrounding circumstances, but the Court must rely on the plain language of the contract, not on extrapolation of extraneous parole evidence. Although the Court's construction of the NDA precludes relief on the related counterclaims, the Court will further explain why the counterclaims fail as a matter of law.

New York law controls the Breach of Contract claim, since the NDA includes a New York choice of law provision. The remaining tort claims are controlled by Virginia law, as tort claims in Virginia are to be "governed by the law of the place of the wrong." *McMillan v. McMillan*, 253 S.E.2d 662, 663 (Va. 1979) (internal citation omitted).

### a. Breach of Contract

Seating Solutions contends that T&B violated the NDA, not by disclosing any information, but rather by using information that Seating Solutions provided in reliance on the NDA to compete with Seating Solutions. (Def. Mem. Supp. Mot. Summ. J. at 16–17.) While not completely clear, Seating Solutions seems to argue that the alleged "use" of information was T&B utilizing its knowledge of the 901 Box Seat to purchase the seats from The Product People. (Def. Mem. Supp. Mot. Summ. J. at 17.) Specifically,

Seating Solutions points to its exclusive knowledge of the existence of the 901 Box Seat, as well as unique mounting techniques. (Def. Mem. Supp. Mot. Summ. J. at 15.)

To prevail on this claim, Seating Solutions must demonstrate "[1] the existence of a contract, [2] the plaintiff's performance under the contract, [3] the defendant's breach of that contract, and [4] resulting damages." *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237, 239 (2010).

Defendant's breach of contract claim founders on the second element, given the Court's finding that the Seat Sale, along with information exchanged pertaining to that potential sale, was beyond the scope of the NDA. T&B's purchase of 901 Box Seats from The Product People cannot be considered a breach of the NDA if the information allegedly "used" to "compete" with Seating Solutions was not covered by the NDA.

Even if the Seat Sale was encompassed by the NDA, or sending the sample seat was intended to demonstrate the value of Seating Solutions' company, T&B's actions still did not violate the NDA's terms. Seating Solutions claims that it provided T&B with non-public "Information" under Paragraph One of the NDA. (Def. Mem. Supp. Mot. Summ. J. at 14–16.) It is telling, however, that none of the 901 Box Seat information sent by Seating Solutions prior to the execution of the NDA was marked as being confidential. The Court is also unaware of any case in which information pertaining to products sold by a distributor with an exclusivity agreement with the product's manufacturer has been found to carry implied confidentiality. Moreover, there is no evidence that other distributors were restricted in placing the seats in question into the stream of commerce, making them available for public inspection.

11

T&B did send Seating Solutions a "due diligence checklist" in order to obtain information specific to its rental business, but no information was provided in return. (Compl. ¶ 14.) Based on the record evidence, none of the information shared regarding the 901 Box Seats would have been covered by Paragraph One of the NDA.

Seating Solutions also contends that T&B violated Paragraph Nineteen of the NDA, which states as follows:

> 19.    Non-Solicitation. Receiving Party [T&B], for itself and on behalf of its Representatives, stipulates, covenants and agrees that from the date hereof and until the date that is two (2) years following the Termination Date, it shall not, directly or indirectly, employ or attempt to employ or retain the service of any director, officer, employee or agent then employed or retained by Company [Seating Solutions] or induce, encourage or solicit any director, officer, employee or agent to leave the employment or service of Company[.] *Receiving Party explicitly agrees that it will not use any information received pursuant to this Agreement to compete with or against the Company*, nor will it use any information received pursuant to this Agreement to solicit any of Company's customers as identified in the Information.

(NDA ¶ 19 (emphasis added).) Specifically, Seating Solutions alleges that T&B used information related to the 901 Box Seat to "compete with or against" them by purchasing seats from The Product People. (Def. Mem. Supp. Mot. Summ. J. at 16–17.)

The Court does not agree with Defendant that the term "compete" in Paragraph Nineteen can be interpreted to apply to T&B's purchase of 901 Box Seats from another vendor. T&B was under no contractual obligation to deal exclusively with Seating Solutions. (NDA ¶ 8.) In fact, the NDA even contemplates other agreements which could potentially be competitive. (NDA ¶ 11.) Further, the NDA expressly acknowledges that parties "may currently or in the future be . . . exploring opportunities

with other persons similar, related or identical to the Purpose or similar business with the products, concepts, systems or techniques contemplated by or embodied in this Information." (NDA ¶ 11.)

Further, there is no allegation that T&B used the information to create their own product, to sell this same product, or to inform a competitor of Seating Solutions of the 901 Box Seat. T&B simply responded to another company's offer to sell the product. It is hard to imagine how this could constitute a "use" or "disclosure" of information to "compete" with Seating Solutions.

In sum, the Seat Sale was not contemplated by the NDA. And even if it was, T&B's purchase of 901 Box Seats from The Product People would not constitute a breach.

### b. Misappropriation of Trade Secrets

Seating Solutions also asserts a claim for Misappropriation of Trade Secrets. (Countercl. ¶¶ 39–43.) This claim is a result of T&B's alleged "use" of mounting techniques shared by Seating Solutions when T&B purchased 901 Box Seats from The Product People. Seating Solutions contends that these mounting techniques constitute a trade secret and that T&B misappropriated the trade secret by using it to its advantage. (Def. Mem. Supp. Mot. Summ. J. at 18–20.)

According to the Virginia Uniform Trade Secrets Act (VUTSA), misappropriation of trade secrets consists of two elements: "(1) the information in question must constitute a trade secret, and (2) that trade secret must have been misappropriated." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416

(E.D. Va. 2004). VUTSA's relevant definition of misappropriation means unauthorized disclosure or use of a trade secret that was"[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" or "[d]erived from …a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Va. Code Ann. § 59.1-336(2).

The Court need not decide whether Seating Solutions' mounting techniques constitute a trade secret. Rather, the claim fails because the information provided to T&B regarding the Seat Sale was not covered by the NDA. Misappropriation requires that a trade secret be provided under circumstances that impose a duty on a party to refrain from using the information. No facts suggest that such a duty existed, beyond the argued application of the NDA. It is again noteworthy that none of the 901 Box Seat information sent by Seating Solutions prior to the execution of the NDA was marked as being confidential. The record fails to support a viable claim.

### c. Misrepresentation

Seating Solutions claims that T&B fraudulently misrepresented its intentions, by representing that all communications regarding the Business Acquisition and Seat Sale would be made with the NDA in mind and subsequently using Seating Solutions' expertise to its advantage when it purchased the seating system from The Product People. (Countercl. ¶¶ 54–59.)

In Virginia, "fraudulent misrepresentation requires that a plaintiff show a '[1] false representation of a material fact; [2] made intentionally, in the case of actual fraud, or negligently, in the case of constructive fraud; [3] reliance on that false representation to

14

their detriment; and [4] resulting damage.'" *Caperton v. A.T. Massey Coal Co.*, 740 S.E.2d 1, 9 (Va. 2013) (internal citations omitted).

This claim appears to be a restatement of the breach of contract claim. Consistent with the Court's finding that the NDA did not apply to the Seat Sale, the record evidence does not support the contention that T&B made a false representation to Seating Solutions. T&B inquired about Seating Solutions' seating products, considered its price quotations, and ultimately decided to purchase the product from a different vendor. None of these actions were governed by the NDA. Seating Solutions' claim for misrepresentation lacks both factual and legal moorings.

## B. Distribution Agreement Validity & Application of its Terms

Seating Solutions next contends that it maintained exclusive rights to sell 901 Box Seats in North America via the Distribution Agreement, and that T&B's purchase of seats from The Product People constituted civil conspiracy and a tortious interference with that contract. (Countercl. ¶¶ 44–53; Def. Mem. Supp. Mot. Summ. J. at 20–27.) These claims are tort actions, therefore governed by Virginia law, and controlled in part by the validity, terms, and limitations of the Distribution Agreement.

There is no disagreement that at one point in time, Seating Solutions had a valid Distribution Agreement with The Product People. (*See* Pl. Mem. Supp. Mot. Summ. J. at 15.) The present dispute focuses on the duration of the agreement and whether it had lapsed prior to T&B's purchase of 901 Box Seats from The Product People. (Pl. Mem. Supp. Mot. Summ. J. at 15–16.) The duration of the agreement is explicitly defined as continuing "until the earlier of 01 June 2011 or termination of this agreement in

15

accordance with its terms." (Distribution Agreement ¶ 5(a).)  Seating Solutions argues that the provision pertaining to the agreement's duration is ambiguous.  (Def. Mem. Supp. Mot. Summ. J. at 21.)  The Court finds its purport beyond peradventure.  The provision unequivocally states that the agreement was to expire on June 1, 2011 or by termination by the parties in accordance with the contract's termination requirements, whichever occurs first.  That expiration undisputedly occurred prior to the negotiations between Seating Solutions and T&B. (Countercl. ¶ 13.)  Additionally, even if the agreement had still been in effect, it required a writing to activate exclusivity. (Distribution Agreement ¶ 4.3(b).)  There is no indication that such a writing exists.

Seating Solutions contends, however, that despite any finding that the duration provision was unambiguous, the agreement was in fact extended by its course of dealing with The Product People.  (Def. Mem. Supp. Mot. Summ. J. at 22.)  While the Court agrees that the terms of a contract may be modified under Virginia law through a course of dealing (*see Reid v. Boyle*, 527 S.E.2d 137, 145 (Va. 2000)), such modification must be demonstrated by "'clear, unequivocal and convincing evidence, direct or implied,'" that it was the intent of the parties to do so. *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983) (quoting *Warren v. Goodrich*, 112 S.E. 687, 694 (Va. 1922)).

Seating Solutions has provided several documents that it argues demonstrate a clear and unequivocal intent to extend the duration of the Distribution Agreement. (Def. Mem. Supp. Mot. Summ. J., Exs. 20–22.)  These documents include marketing materials

for the 901 Box Seat that display the Seating Solutions logo, as well as e-mail communications between Seating Solutions and The Product People.

The Court finds Seating Solutions' proffered evidence unavailing. The communications exchanged between Seating Solutions and The Product People seem to indicate an interest in maintaining some sort of distribution relationship, but do not clearly and unequivocally show that the parties wished to extend the Distribution Agreement or any exclusive relationship.[1]  Therefore, based on the Distribution Agreement's own terms, and the lack of any evidence supporting a clear course of dealing or expectancy, it appears that the agreement expired prior to T&B's purchase of the seating at issue. Defendants' claim therefore falls short of the mark.

### a.  Tortious Interference with Contract

Seating Solutions asserts that T&B, by buying 901 Box Seats from The Product People, tortiously interfered with a business relationship that Seating Solutions maintained with The Product People. (Countercl. ¶¶ 44–48.) As noted above, Seating Solutions claims it had a valid contract, or at least a valid business expectancy, and that T&B damaged its business interests by purchasing 901 Box Seats from The Product People. (Countercl. ¶¶ 21–29.)

The elements of tortious interference with a contract or business expectancy are as follows: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional

---

[1] Notably, The Product People explicitly state, after the Distribution Agreement's expiration date, that they do not have a contractual relationship with Seating Solutions, but rather a "gentlemen's agreement." (Def. Mem. Supp. Mot. Summ. J., Ex. 23.)

interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). This Court's finding that Seating Solutions had no valid contract or expectancy with The Product People at the relevant time precludes the tortious interference claim.

Even if the Court found the Distribution Agreement to be binding, its requirements for exclusivity were not met. The terms of the agreement provide explicit procedures by which Seating Solutions may obtain exclusive rights. Seating Solutions failed to comply with those terms. Exclusivity is addressed in the Distribution Agreement as follows:

> (a) The appointment of the Distributor under this Agreement is non-exclusive to the Distributor for the Term in the Territory solely in respect of the Markets.
> (b) Notwithstanding clause 4.3(a), the Company agrees to appoint the Distributor exclusively only for such projects in the Territory in respect of the Markets which the Distributor has submitted a proposal for the Products to the end-client. The Distributor has to obtain the Companies written approval for such projects in order to activate the exclusivity on a project and such written approval is not unreasonably withheld by the Company.

Distribution Agreement ¶4.3.

Seating Solutions argues that in the event no valid contract is found, the evidence supports a business expectancy with The Product People. (Def. Mem. Supp. Mot. Summ. J. at 23.) Business expectancy is a valid component of the first element of tortious interference with contract under Virginia law. *See Chaves*, 335 S.E.2d at 102.

In order for Seating Solutions to have obtained exclusivity to sell to T&B, The Product People must have provided written approval of such exclusivity. Although

Seating Solutions asserts that it "registered" T&B with The Product People, it also admits that no written approval was provided by Seating Solutions granting exclusivity. (Def. Mem. Supp. Mot. Summ. J., Ex. 45, Suprina Dep. at 96–97.)  Without such a writing, Seating Solutions' claim of exclusivity is illusory at best.  Based on the analysis above, however, it is this Court's opinion that Seating Solutions did not have a valid business expectancy with The Product People.

### b. Civil Conspiracy

Finally, Seating Solutions contends that T&B conspired with The Product People to deprive Seating Solutions of its valid contractual rights or expectancy, which resulted in damage to Seating Solutions.  (Countercl. ¶¶ 49–53.)  Under Virginia law, "civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to the plaintiff." *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984).

The unlawful purpose identified by Seating Solutions is the decision by T&B and The Product People to disregard the Distribution Agreement and the NDA, and to proceed with the sale of 901 Box Seats to Seating Solutions' detriment.  This Court has already found that the NDA did not apply to the Seat Sale, and even if it did, T&B did not breach the NDA's terms.  The Court has also found that the Distribution Agreement was invalid at the time of the relevant transaction, and there was no legitimate business expectancy.  Consistent with these findings, this claim fails.

## IV.   CONCLUSION

In sum, even when viewing the facts in the light most favorable to the Defendant, the Court finds that Plaintiff's purchase of 901 Box Seats did not violate the NDA. Further, Defendant's five counterclaims, which include Breach of Contract, Misappropriation of Trade Secrets, Misrepresentation, Tortious Interference with Contract, and Civil Conspiracy, each fail as a matter of law.  Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 30) will be granted and Defendant's Motion for Summary Judgment (ECF No. 37) will be denied.

An appropriate Order will accompany this Memorandum Opinion.


                                                                /s/
                                                Henry E. Hudson
Date: July 22, 2016                     United States District Judge
Richmond, Virginia